### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| Thomas Curvier, | § | |
| Plaintiff, | § | |
| | § | CASE NO. 5:21-cv-00618 |
| | § | |
| v. | § | |
| | § | |
| Equifax Information Services, LLC; | § | |
| TransUnion, LLC; Generations | § | |
| Community Federal Credit Union; | § | |
| Business and Professional Service; and | § | |
| DOES 1 through 100 inclusive, | § | |
| | § | |
| Defendants. | § | |

COMES NOW Plaintiff **THOMAS CURVIER** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

### INTRODUCTION

1.      This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debts.

2.      Defendant Business and Professional Service ("B&P") is not reporting Plaintiff's account accurately since it was discharged in bankruptcy.

3.      Defendant Generations Community Federal Credit Union ("Generations") is not reporting Plaintiff's account accurately since it was discharged in bankruptcy.

4.      The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

5.      A pervasive and fundamental misunderstanding presently thrives in the United States regarding the long-term impact that filing a consumer bankruptcy has on the consumer's creditworthiness. Specifically, consumers tend to believe that since a bankruptcy can be reported

on their credit report for ten (10) years, their creditworthiness will be ruined for the same length of time. This is not true.

6.      The *majority* of consumer debtors file a consumer bankruptcy to *raise* their FICO Score and remedy their poor creditworthiness.

7.      In fact, it is possible for consumer debtors to obtain a 700 FICO Score as soon as twelve (12) months from filing a consumer bankruptcy (Chapter 7 or Chapter 13).

8.      Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys the consumer's creditworthiness of ten (10) years; however, to perpetrate this bankruptcy myth, creditors intentionally and routinely ignore both industry standards and FCRA requirements for accurately reporting bankruptcies, as well as the debts included in those bankruptcies, to keep consumers' credit scores low and their interest rates high.

9.      Creditors know that deviating from recognized credit reporting standards and FCRA requirements will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

10.     This was not the intent of Congress when it enacted the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

## JURISDICTION & VENUE

11.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

12.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

13.     This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

14.     Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each named Defendant conducts sufficient business within the forum state and this Court has personal jurisdiction over Defendants under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

///

///

///

///

///

///

## GENERAL ALLEGATIONS

15.     Plaintiff alleges that the B&P account and the Generations account were both included in Plaintiff's Chapter 7 bankruptcy filing in that the debts occurred pre-petition and were subsequently discharged.

16.     Plaintiff alleges that it is patently incorrect and misleading for a debt which was discharged in bankruptcy to be reported on a credit report with an outstanding balance as this reporting makes it appear as if the debt is still owed and collectible.

17.     Plaintiff alleges that the B&P account is reporting on his TransUnion credit report twice; once as an open account with a balance and once as a collections account with a balance.

18.     Plaintiff alleges that a single account cannot be listed on a credit report more than once.

19.     Plaintiff alleges that reporting a discharged debt in the manner as described herein is an attempt by B&P to collect on a discharged debt.

20.     Plaintiff alleges that it is patently incorrect and misleading for a debt which was discharged in bankruptcy to be reported on a credit report as currently past due as this reporting makes it appear as if the debt is still collectible.

21.     Plaintiff alleges that Generations is reporting the discharged account in question as past due despite correctly reporting a second account as discharged.

22.     Plaintiff alleges that each and every Defendant is familiar with the FCRA requirements and subscribes thereto.

23.     Plaintiff alleges that each and every Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

24.     Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine Plaintiff's ability to repair his Credit Score.

25.     In the alternative, Plaintiff alleges that each and every Defendants' actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

26.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     FICO, Inc.**

27.     FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

28.     The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions.

29.     A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

30.     Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

31.     Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

32.     There are twenty-eight (28) FICO Scores that are commonly used by lenders.

33.     A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

34.     The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

35.     FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

36.     There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

37.     Each of the five (5) factors is weighted differently by FICO.

38.     In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

39.     Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

40.     In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

41.     Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

42.     FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

43.     The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both Chapters have the same level of severity with respect to their FICO Score and FICO uses the filing date, under both Chapters, to determine how long ago the bankruptcy took place.

44.     A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." See https://www.myfico.com/credit-education/what-is-a-fico-score. If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". *See Id*.

///

**B.      Metro 2**

45.      The Consumer Data Industry Association ("CDIA") is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening, and collection services industries.

46.      The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by CDIA to universally report debts in a particular manner.

47.      The CDIA's Metro 2 format is the credit reporting industry standard for credit reporting. While CDIA's Metro 2 format is intended to standardize credit reporting, this standard is still subject to the FCRA's requirement of *maximum possible accuracy and completeness.*

48.      The credit reporting industry at large depends upon the Metro 2 format and the CDIA's recommendations for reporting debt.

49.      The CDIA is experienced in credit reporting. In support of this allegation, Plaintiff avers the following:

    a.      The CDIA offers a FCRA certificate program for all CRAs.

    b.      The CDIA offers a FCRA awareness program for all CRAs.

    c.      The CDIA offers a FCRA certificate program for DFs.

    d.      The CDIA offers a FCRA awareness program for DFs.

    e.      The CDIA offers a Metro 2 learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 format as well as the relationship between multiple fields.

    f.      The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and TransUnion.

    g.      The CDIA developed a credit reporting resource guide for accurately reporting credit.

50.      The CDIA's Metro 2 format is accepted by all CRAs.

51.      The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide ("CRRG").

52.      The CRRG outlines the industry standards for reporting debts using Metro 2 format.

53.      The CRRG is not readily available to the public. It can be purchased for $229.45.

54.     Even if a buyer is ready, willing, and able to pay for the CRRG, the CDIA will <u>not</u> grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

55.     When FICO calculates credit scores, the algorithms use Metro 2 information based on industry standards established by the CDIA.

56.     The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

57.     If the Metro 2 data received by FICO deviates from the FCRA requirements or industry standards, an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower, a consumer will be considered a higher credit risk resulting in less favorable lending terms.

**C.     e-OSCAR**

58.     e-OSCAR is the web-based, Metro 2 compliant system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

59.     When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

60.     The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g., "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

**D.     Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator**

61.     When a consumer files bankruptcy, certain credit reporting industry standards exist.

62.     Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's creditworthiness.

63.     The Consumer Information Indicator ("CII") is a critical field in the Metro 2 format that indicates a special condition that applies to a specific consumer.

64.     Under Metro 2, the CII must be reported on only the consumer to whom the information applies.

65.     It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

///

66.     In the consumer bankruptcy context, CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed and is active, but no discharge has been entered.

67.     CII Metro 2 Code "D" indicates that a Chapter 13 petition has been filed and is active, but no discharge has been entered. This is usually translated on a consumer credit report as "Wage Earner Plan" or "WEP" in the "Account Status" portion of a tradeline. Such reporting alerts any potential lender that the account is no longer in a collectable status and is being handled by a Chapter 13 trustee.

68.     The CII Metro 2 Code "Z" indicates that a bankruptcy petition has been filed, but the chapter is undesignated/unknown.

69.     The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

70.     The CII Metro 2 Code "H" denotes that a Chapter 13 bankruptcy has been discharged. In addition, post discharged balances and past due balances should be updated to reflect zero (0) balances. The payment history should also not reflect missed payments moving forward.

71.     The CII Metro 2 Code "R" denotes reaffirmation of a debt. In addition, completely reaffirmed debts should report appropriate Account Status and account information as it applies going forward.

72.     The CII field is a critical field for consumers as it directly relates and impacts a consumer's creditworthiness.

73.     The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

74.     Furthermore, the lack of a CII reported suggests that creditors are free to collect against a consumer as an individual, or that no stay exists to prevent in personam collection activity.

75.     Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference than if the appropriate CII indicator were reported.

76.     The FRCA permits a bankruptcy to be reported for ten (10) years from the date the bankruptcy was filed.

77.     A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

78.     The bankruptcy's impact on a consumer's FICO Score lessens with the passage of time.

79.     Accordingly, the failure to reference the bankruptcy filing (CII field) and/or the correct petition date results in a lower FICO Score, which in turn causes credit decision makers to draw a more negative inference regarding a consumer's creditworthiness.

**E.      Plaintiff's Debt was Discharged Pursuant to his Bankruptcy**

80.     Plaintiff filed a voluntary petition for Chapter 7 bankruptcy on July 30, 2020 in order to repair his creditworthiness and FICO Score.

81.     The Chapter 7 Trustee's Report of No Distribution was entered on August 29, 2020.

82.     Plaintiff's bankruptcy was discharged on October 29, 2020.

**F.      Plaintiff's Credit Report Contains Inaccurate Adverse Tradelines, which Plaintiff Disputed to no Avail**

83.     On March 20, 2021, Plaintiff ordered a three-bureau credit report from Experian to ensure proper reporting by Plaintiff's creditors (the "March 20 Credit Reports").

84.     Plaintiff noticed adverse tradelines in his March 20 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with FCRA standards.

85.     Plaintiff then disputed the inaccurate tradelines regarding the account with B&P via certified mail to TransUnion, and regarding the account with Generations via certified mail to TransUnion and Equifax; both sent on or about April 5, 2021 (the "Dispute Letters").

86.     Regarding the TransUnion report, Plaintiff's Dispute Letter specifically put B&P on notice that Plaintiff filed for chapter 7 bankruptcy, received a discharged, and that Plaintiff's account should be updated.

87.     Regarding the TransUnion and Equifax reports, Plaintiff's Dispute Letters specifically put Generations on notice that Plaintiff filed for chapter 7 bankruptcy, received a discharged, and that Plaintiff's account should be updated.

88.     Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the accounts as required by the FCRA.

89.     Plaintiff is informed and believes that TransUnion received Plaintiff's Dispute Letter and, in response, sent Plaintiff's dispute to B&P, as the data furnisher, via an ACDV through e-OSCAR.

//

90.    Plaintiff is informed and believes that TransUnion and Equifax each received Plaintiff's Dispute Letters and, in response, sent Plaintiff's disputes to Generations, as the data furnisher, via an ACDV through e-OSCAR.

91.    On May 14, 2021, Plaintiff ordered a second three-bureau credit report from Experian to determine if his accounts were updated.

**a.    Inaccuracy – B&P**

92.    Despite actual knowledge, B&P continued to report Plaintiff's account, beginning in 203140XXXXXXXXXXX, to TransUnion with an account type of "Open account", current balance of "$134", and without any bankruptcy notation. Further, this account is reported as two separate tradelines, each listing the full balance. This is patently incorrect as this account was discharged in bankruptcy, and a single account cannot be reported more than once.

93.    Reporting a single account as two tradelines, each listing the full balance, is patently incorrect. Further, as the algorithms that calculate credit scores cannot account for or offset duplicated reporting, this type of reporting is also misleading to an extent to adversely affect credit decisions.

94.    Plaintiff alleges that B&P did not investigate whether Plaintiff filed for bankruptcy.

95.    B&P did not update the tradelines to reflect that Plaintiff obtained a discharge in bankruptcy or delete the duplicated tradeline.

96.    TransUnion provided notice to B&P that Plaintiff was disputing the inaccurate and misleading information, but B&P failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

97.    Based on Plaintiff's dispute, B&P should have known that Plaintiff received a discharge in his bankruptcy proceedings.

98.    The most basic investigation would include a simple review of its reporting in light of the fact that Plaintiff filed a chapter 7 bankruptcy and received his discharged in order to determine if the reporting complies with the maximum possible accuracy and completeness standard of the FCRA.

99.    Plaintiff alleges that B&P did not review if its reporting complied with the unambiguous language of the FCRA or regulatory guidelines on accurate reporting under the FCRA.

///

100. If B&P reviewed such standards, B&P would have seen that its reporting was not in compliance and was therefore patently incorrect or incomplete.

101. B&P should have updated the CII to Metro 2 Code "E" to reflect the debt was discharged in Plaintiff's Chapter 7 bankruptcy, closed the account, changed the balance to zero, and deleted the duplicated account.

102. By continuing to report Plaintiff's account to TransUnion as an open account with a balance, it appears to third parties viewing Plaintiff's credit report that the account was not discharged in bankruptcy and may still be collectible, which is inaccurate.

103. Further, as this inaccurate reporting is being used to calculate Plaintiff's FICO Score, the FICO Score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

104. The lack of investigation and reporting of inaccurate and incomplete information by B&P is unreasonable.

b. **Inaccuracy – Generations**

105. Despite actual knowledge, Generations continued to report Plaintiff's account, beginning in 152318XXXXX, to TransUnion with a current payment status of "30 days past due". This is patently incorrect as this account was discharged in bankruptcy.

106. Despite actual knowledge, Generations continued to report Plaintiff's account, beginning in 152318XXXXX, to Equifax with a current payment status of "Not more than two payments past due". This is patently incorrect as this account was discharged in bankruptcy.

107. Plaintiff alleges that Generations did not investigate whether Plaintiff filed for bankruptcy.

108. Generations did not update the tradelines to reflect that Plaintiff obtained a discharge in bankruptcy.

109. TransUnion and Equifax both provided notice to Generations that Plaintiff was disputing the inaccurate and misleading information, but Generations failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

110. Based on Plaintiff's disputes, Generations should have known that Plaintiff received a discharge in his bankruptcy proceedings. In fact, Generations managed to correctly report a second account of Plaintiff's, beginning in 407954XXXXXXXXXXX, as "Included in

Bankruptcy" to both Equifax and TransUnion. This shows Generations had knowledge of the bankruptcy and its inaccurate reporting was willful.

111.    The most basic investigation would include a simple review of its reporting in light of the fact that Plaintiff filed a chapter 7 bankruptcy and received his discharged in order to determine if the reporting complies with the maximum possible accuracy and completeness standard of the FCRA.

112.    Plaintiff alleges that Generations did not review if its reporting complied with the unambiguous language of the FCRA or regulatory guidelines on accurate reporting under the FCRA.

113.    If Generations reviewed such standards, Generations would have seen that its reporting was not in compliance and was therefore patently incorrect or incomplete.

114.    Generations should have updated the CII to Metro 2 Code "E" to reflect the debt was discharged in Plaintiff's Chapter 7 bankruptcy and removed the past due payment status.

115.    By continuing to report Plaintiff's account to TransUnion and Equifax with a past due payment status, it appears to third parties viewing Plaintiff's credit report that the account was not discharged in bankruptcy and may still be collectible, which is inaccurate.

116.    This reporting is especially misleading as a second account with the same data furnisher does reflect the bankruptcy discharge.

117.    Further, as this inaccurate reporting is being used to calculate Plaintiff's FICO Score, the FICO Score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

118.    As payment history (including payment status) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect payment status reported by Generations on the account is lowering Plaintiff's credit score, which adversely affects Plaintiff's ability to obtain credit.

119.    The lack of investigation and reporting of inaccurate and incomplete information by Generations is unreasonable.

**G.    Damages**

120.    Plaintiff pulled the credit reports at issue at a cost for access to the report, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

121.    As a result of the incorrect reporting, Plaintiff has incurred out-of-pocket expenses, and has also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as to the effectiveness of the Bankruptcy Code, the Fair Credit Reporting Act, and the power of this Court to preserve and perpetuate a fresh start as intended by Congress.

122.    Plaintiff has been denied credit and is unable to rebuild his credit based on the inaccurate reporting by B&P.

123.    Plaintiff has been denied credit and is unable to rebuild his credit based on the inaccurate reporting by Generations.

124.    B&P's and Generations' actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

**FIRST CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))**

**(Against Defendants and Does 1-100)**

125.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    TransUnion and Equifax Each Failed to Assure Credit Reporting Accuracy**

126.    TransUnion and Equifax (collectively, the "CRA Defendants") each violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

127.    Had Equifax maintained reasonable procedures to assure maximum accuracy, it would never have never allowed Generations to report its account as described herein.

128.    Had TransUnion maintained reasonable procedures to assure maximum accuracy, it would never have allowed B&P or Generations to report their respective accounts as described herein.

129.    TransUnion knew, or should have known, (1) that the B&P account was included and discharged in bankruptcy, (2) that the B&P account should not have been reported as described herein on account of the Chapter 7 discharge, and (3) that reporting a single account twice, each with a balance, is patently incorrect and misleading. Further, TransUnion knew, or should have known, that this inaccurate and incomplete tradeline does not reflect maximum possible accuracy and completeness as required by the FCRA.

130.    TransUnion knew, or should have known, (1) that the Generations account was included and discharged in bankruptcy, and (2) that the Generations account should not have been reported as described herein on account of the Chapter 7 discharge. Further, TransUnion knew, or should have known, that this inaccurate and incomplete tradeline does not reflect maximum possible accuracy and completeness as required by the FCRA.

131.    Equifax knew, or should have known, (1) that the Generations account was included and discharged in bankruptcy, and (2) that the Generations account should not have been reported as described herein on account of the Chapter 7 discharge. Further, Equifax knew, or should have known, that this inaccurate and incomplete tradeline does not reflect maximum possible accuracy and completeness as required by the FCRA.

132.    Congress specifically recognized the "elaborate mechanism developed for investigating and evaluating credit worthiness, credit standing, credit capacity, character, and general reputation of consumers." *Nayab v. Capital One Bank (USA), NA*, 942 F. 3d 480, 492 (9th Cir. 2019). The investigation and evaluation of Plaintiff's credit worthiness, credit standing, credit capacity, character and general reputation as a consumer are all damaged by the inaccurate reporting Equifax and TransUnion each allowed.

133.    As a result of the CRA Defendant's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit and other mental and emotional distress.

**B.    Willful Violations**

134.    The CRA Defendants' violations, as described herein, were willful; specifically, the CRA Defendants have intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

135.    The CRA Defendants regularly, as a policy, ignore disputes by consumers and fail to perform even a basic investigation regarding the disputes. Additionally, the CRA Defendants regularly fail to forward disputes to data furnishers, thereby frustrating the entire dispute process.

136.    To the extent the CRA Defendants do send consumer disputes, they send these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

137.    The CRA Defendants' employees receive little to no training concerning how to accurately report consumer debt.

138.    Instead, the CRA Defendants' employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

139.    The CRA Defendants' employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

140.    The CRA Defendants have intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

141.    As a result of the CRA Defendants' violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

142.    The CRA Defendants' violations were willful, rendering each individually liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

143.    In the alternative, the CRA Defendants were each negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

144.    Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from the CRA Defendants in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**SECOND CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1))**

**(Against Defendants and Does 1-100)**

145.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    B&P Failed to Reinvestigate Following Plaintiff's Dispute**

146.    Pursuant to 15 U.S.C. §§ 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

147.    In or about November 9, 2020, B&P sent an Automated Universal Dataform ("AUD") to TransUnion reporting the account as an open collections account with a balance.

148.    After receiving the Dispute Letter from TransUnion, B&P did not correct the account status, balance, or duplicated tradeline, but instead verified and re-reported the incorrect information as "accurate" via ACDV to TransUnion.

149.    The account status and balance reported in an AUD or ACDV represents the status of the account at the time of sending the AUD or ACDV, and is not a historical contractual item (i.e., monthly payment, highest balance, payment history, etc.). Therefore, the fact that the account may have previously had an outstanding balance, if at all, has no bearing on its current status after the bankruptcy discharge.

150.    B&P violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading and inaccurate account information.

151.    TransUnion provided notice to B&P that Plaintiff was disputing the inaccurate and misleading information; however, B&P failed to conduct a reasonable investigation as required by the FCRA.

152.    Based on Plaintiff's dispute, B&P should have known its account was included in Plaintiff's Chapter 7 bankruptcy and ceased its inaccurate reporting.

153.    B&P's reporting on the account is an attempt to collect on a discharged debt.

154.    Reporting a discharged debt as an open account and collections account, both listing a balance, is patently incorrect as it appears that it is still collectible and outstanding. In addition, this inaccurate reporting also adversely affects credit decisions. Number of collection accounts, account statuses, and outstanding balances all factor into calculating a Credit Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported FICO Score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, B&P's reporting as described herein has a direct adverse effect on Plaintiff's Credit Score and his ability to rebuild his credit score and obtain new credit.

155.    The lack of investigation by B&P, as required by the FCRA, is unreasonable.

**B.    Generations Failed to Reinvestigate Following Plaintiff's Dispute**

156.    Pursuant to 15 U.S.C. §§ 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe,

that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

157.    Generations sent an AUD to TransUnion and to Equifax reporting the account payment status as past due. Once noticed of the bankruptcy proceedings, Generations sent an AUD to TransUnion and Equifax updating the status of a second account and properly reporting the bankruptcy; however, Generations failed to update the account in question.

158.    After receiving the Dispute Letters from TransUnion and Equifax, Generations did not correct the payment status, but instead verified and re-reported the incorrect information as "accurate" via ACDV to TransUnion and ACDV to Equifax.

159.    The payment status reported in an AUD or ACDV represents the status of the account at the time of sending the AUD or ACDV, and is not a historical contractual item (i.e., monthly payment, highest balance, payment history, etc.). Therefore, the fact that the account may have previously been past due, if at all, has no bearing on its current pay status after a bankruptcy discharge.

160.    Generations violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading and inaccurate account information.

161.    TransUnion and Equifax both provided notice to Generations that Plaintiff was disputing the inaccurate and misleading information; however, Generations failed to conduct a reasonable investigation as required by the FCRA.

162.    Based on Plaintiff's disputes, notices in bankruptcy, and its reporting on a second account by the same consumer, Generations should have known its account was included in Plaintiff's Chapter 7 bankruptcy and ceased its inaccurate reporting.

163.    Reporting a discharged debt with a past due payment status is patently incorrect as it appears that it is still collectible and outstanding. In addition, this inaccurate reporting also adversely affects credit decisions. Payment history (including payment status), at thirty-five percent (35%), is the single largest factor into calculating a Credit Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported FICO Score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, Generations' reporting as described herein has a direct adverse effect on Plaintiff's Credit Score and his ability to rebuild his credit score and obtain new credit.

164.    The lack of investigation by Generations, as required by the FCRA, is unreasonable.

**C.    Willful Violations**

165.    Plaintiff alleges that B&P and Generations have each reported based upon objectively unreasonable interpretations of the FCRA standards of credit reporting and regulatory guidelines on how to accurately reporting under the FCRA.

166.    Plaintiff further alleges that B&P and Generations have not properly trained those directly investigating disputes on FCRA requirements or credit reporting industry standards and, as such, have developed reckless policies and procedures.

167.    Plaintiff alleges that rather than train its employees on accurate credit reporting, FCRA requirements, and industry standards, B&P's and Generations' respective employees tasked with reviewing disputes are expected to blanketly confirm the information being reported "as accurate" instead of investigating the reporting.

168.    In the alternative, B&P and Generations were each negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

**D.    The CRA Defendants Each Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)**

169.    Pursuant to 15 U.S.C. 1681i(a)(1), the CRA Defendants were each required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's disputes regarding the B&P and Generations accounts.

170.    Thus, the CRA Defendants each failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the accounts within the statutory time frame.

171.    The CRA Defendants are not passive entities bound to report whatever information a data furnisher provides.

172.    Plaintiff alleges the CRA Defendants are readily familiar with FCRA requirements and credit reporting industry standards.

173.    Based on the foregoing, Plaintiff alleges that the CRA Defendants can, and do, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

174.    The CRA Defendants can and do instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

175.     Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that Generations was not reporting its account at issue correctly.

176.     Had Equifax conducted a proper investigation it could have closed or bookended the Generations account by adding a notation on the credit report on its tradeline that the debt was in fact included and discharged in Plaintiff's Chapter 7.

177.     However, Equifax continued to report the Generations account as described herein.

178.     TransUnion failed to conduct a reasonable investigation because any basic investigation would have uncovered that Generations was not reporting its account at issue correctly.

179.     Had TransUnion conducted a proper investigation it could have closed or bookended the Generations account by adding a notation on the credit report on its tradeline that the debt was in fact included and discharged in Plaintiff's Chapter 7.

180.     However, TransUnion continued to report the Generations account as described herein.

181.     In addition, TransUnion failed to conduct a reasonable investigation because any basic investigation would have uncovered that B&P was not reporting its account at issue correctly.

182.     Had TransUnion conducted a proper investigation it could have closed or bookended the B&P account by adding a notation on the credit report on its tradeline that the debt was in fact included and discharged in Plaintiff's Chapter 7.

183.     However, TransUnion continued to report the B&P account as described herein.

184.     The CRA Defendants, therefore, did not conduct even the most basic investigations regarding credit reporting industry standards, otherwise the aforementioned would have been uncovered.

**THIRD CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))**

**(Against Defendants and Does 1-100)**

185.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     The CRA Defendants Each Failed to Review and Consider all Relevant Information**

186.     The CRA Defendants each violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

187.    The CRA Defendants' violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.    Willful Violations**

188.    The CRA Defendants' violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

189.    In the alternative, the CRA Defendants were each negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

190.    Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from the CRA Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**FOURTH CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))**

**(Against Defendants and Does 1-100)**

191.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    The CRA Defendants Each Failed to Delete Disputed and Inaccurate Information**

192.    The CRA Defendants each violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

193.    The CRA Defendants' violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.    Willful Violations**

194.    The CRA Defendants' violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

195.    In the alternative, the CRA Defendants were each negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

///

///

196.    Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from the CRA Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**PRAYER FOR RELIEF**

197.    WHEREFORE, Plaintiff prays for judgment as follows:

    a.   For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

    b.   Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

    c.   Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

    d.   Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

    e.   For determination by the Court that Defendant's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq*.; and

    f.   For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.


Respectfully submitted,


**SCHUMACHER LANE PLLC**

Dated: July 1, 2021                    */s/ Kyle Schumacher*
                                       Kyle Schumacher
                                       Attorneys for Plaintiff

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial of this matter by jury.


**SCHUMACHER LANE PLLC**

Dated: July 1, 2021                                    */s/ Kyle Schumacher*
                                                       Kyle Schumacher
                                                       Attorneys for Plaintiff